IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| RON ADDISON, KEVIN BENSON, J.D. BLAKES, TYRONE GASTON, JIM HERRINGER, KENNETH HUEMMER, CARL McKNIGHT, NATHANIEL ROBERTS, MICHAEL SMITH, RANDY STEVENSON, and RALPH TOWNES, | ) ) ) ) ) ) ) | Case No. 09 C 4272  Judge Virginia M. Kendall |
| Intervening Plaintiffs, | ) ) | |
| v. | ) ) | |
| WRS INFRASTRUCTURE AND ENVIRONMENT, INC. | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

The Equal Employment Opportunity Commission (EEOC) and eleven former

employees—seven black, four white—of WRS Infrastructure and Environment, Inc. ("WRS") sued

WRS alleging that the company's environmental clean-up worksite near Lake Calumet in Chicago

was a racially hostile workplace. Specifically, the black employees allege that they were subject to

constant racial harassment, most notably a large noose placed on the work truck of one of the black

employees. The four white employees assert that they too were harassed by their white co-workers

because they associated with black employees. Two black plaintiffs, Carl McKnight and Ralph

Townes, also allege they were fired because of their race. Similarly, two white plaintiffs, Kevin

Benson and Randy Stevenson, assert they were fired for engaging in protected activity (Benson) and

in retaliation for associating with black employees (Stevenson). For the below reasons, the Court

denies in part and grants in part WRS's motion for summary judgment. A reasonable jury could find that the black employees were subject to a hostile work environment based on their race, and that WRS may be held responsible for it. The white employees' hostile work environment claim, however, is based on isolated statements regarding their association with black employees and was not objectively hostile as a matter of law. The Court also grants summary judgment to WRS on Stevenson's termination claim, but denies it as to McKnight's, Townes's, and Benson's claims.

## I.     MATERIAL UNDISPUTED FACTS[1]

### A.     Background

Between 2006 and April 2008, WRS was in charge of soil remediation at a large abandoned industrial site near Lake Calumet on Chicago's far south side on behalf of the Illinois Environmental Protection Agency (IEPA). (Pl. 56.1 Resp. ¶ 1.) WRS's employees at the site included black plaintiffs Ron Addison, J.D. Blakes, Tyrone Gaston, McKnight, Nathaniel Roberts, Michael Smith, and Townes, as well as white plaintiffs Benson, Jim Herringer, Kenneth Huemmer, and Stevenson. (Def. 56.1 Resp. ¶ 3.) At any one point, WRS had between six and twenty heavy equipment operators and two to four laborers on the site under the supervision of Field Superintendent Robert Heck. (Pl. 56.1 Resp. ¶¶ 2-4.) The operators came from one union and the laborers another. (*Id.* at ¶ 4.) Though the parties dispute the degree of control he had over his fellow operators, Jerry

---

[1] WRS asked the Court to strike various facts in the plaintiffs' Local Rule 56.1 statement on hearsay and other grounds. The Court has disregarded facts not properly presented. Similarly, the plaintiffs have asked the Court to strike WRS's "reply facts," which were two dozen new facts presented with WRS's reply brief. WRS asserts that it had leave of Court to present these facts, even though those facts are not provided for by Local Rule 56.1, which permits the movant to present facts only with its opening brief. The minute order on this issue is not clear that the Court intended the moving party (or parties) to have 225 facts in support of summary judgment, with 100 additional facts for the non-moving party, a ratio similar to the 80/40 default ratio in Local Rule 56.1. It is clear that both parties relied on the minute order entered by the Court, because WRS filed the reply facts and the EEOC and intervening plaintiffs filed more than 100 additional facts supporting denial of WRS's summary judgment motion. The Court will not strike either sides' facts based on this confusion, and has considered all the facts (and underlying evidence) presented by the parties. In any event, WRS's reply facts do not change the Court's summary judgment analysis.

McNeely—the alleged instigator of much of the racial harassment—was the operator's craft foreman for five months in 2007. (Pl. 56.1 Resp. ¶ 7.)[2]

**B.     Harassment of Black Employees**

**1.     Harassment Applicable to Multiple Plaintiffs**

a.     <u>October 2007 Noose and Investigation</u>

When he arrived at work on the morning October 11, 2007, Roberts, one of the black employees, found a noose on the steering wheel of his dump truck. (Pl. 56.1 Resp. ¶ 12.) Black plaintiffs Addison, Blakes, Gaston and Smith saw the noose. (*Id.*; Def. 56.1 Resp. ¶ 19.) Heck called back all the employees to the site's break trailer and asked who put the noose on Roberts' truck. (Pl. 56.1 Resp. ¶ 13.) No one confessed. (*Id.*) Heck continued the investigation by meeting with Roberts together with the on-site representatives of the unions: McNeely for the operators and Blakes for the laborers. (*Id.* at ¶ 14.)

Later that day, WRS Program Office Manager Richard Scott arrived from Springfield, Illinois to continue the investigation. (*Id.* at ¶ 16.) He interviewed the other operators, met with on-site management and union officials, and, according WRS (but disputed by the plaintiffs), reviewed the WRS anti-harassment policy in a meeting with the operators. (*Id.* at ¶ 17.) At some point (though possibly not the day the noose appeared), Scott asked Roberts if he wanted WRS to notify the police, but Roberts declined. (*Id.* at ¶ 16.) The next day, Scott met with the laborers for the same reasons and ended the investigation by explaining to Roberts that WRS had not found the individual that put the noose on his truck. (*Id.* at ¶ 18.) That day, Huemmer saw Joe McNeely, a white operator and

---

[2]At least one employee told a WRS manager that McNeely was "prejudiced" before McNeely became craft foreman. (Huemmer Dep. at 137-38.)

father of McNeely, doing a "victory dance," though beyond its timing, it is unclear what connection, if any, the dance had to the noose. (Def. 56.1 Resp. ¶ 20.) WRS did not notify any authorities about the noose, did not make any changes to its harassment policy in response to the incident, and did not conduct sensitivity training (as suggested by its general counsel). (Def. 56.1 Resp. ¶¶ 85, 92.) On January 30, 2008, WRS management found out that the local NBC affiliate intended to run a story regarding racial harassment at the Lake Calumet site. (Def. 56.1 Resp. ¶ 191.) After the story ran, WRS's communications consultant recommended diversity training for the site's employees, but WRS made no further efforts to discuss any racial harassment with the union employees at the site. (*Id.* at ¶ 93.) A few months later, Townes complained to the Federal Bureau of Investigation about the noose. (Pl. 56.1 Resp. ¶ 19.)

b.    Other Incidents

Aside from the noose incident, a number of other racially charged incidents were reported. For example, Ron Mathis, a white WRS employee, wore a Confederate flag bandana on the worksite and Brian Rice put a Confederate flag bumper sticker on both his personal and work trucks. (Def. 56.1 Resp. ¶¶ 14-16, 64; Hunter Dep. at 156-57.)  On another occasion, all the black plaintiffs except McKnight saw a noose wrapped around a stuffed white sheep hanging from white operator Brian Rice's truck. (Def. 56.1 Resp. ¶ 17; Pl. 56.1 Resp. ¶ 26.)[3] Heck saw it too, and Blakes complained to him about it several times, but Heck did not talk to anyone about it. (Def. 56.1 Resp. ¶ 63; Pl. 56.1 Resp. ¶ 54.) Townes also complained to Rice directly about the noose, telling him it

_____

[3] Addison and Gaston overheard conversations suggesting the noose was an inside joke between two white operators about sheep, not a racially hostile act. (Pl. 56.1 Resp. ¶¶ 27, 67.)

was "grossly offensive to people of color." (Pl. 56.1 Resp. ¶ 131.) Rice told Townes it was "just a piece of string" and kept it on his truck for at least a few more days. (*Id.* at ¶ 132.)

On another occasion, although WRS asserts it was a sunglass holder (*Id.* at ¶ 28), all the black plaintiffs, except Roberts, saw a second noose hanging from the rear-view mirror of Rice's personal truck. (Def. 56.1 Resp. ¶ 18.) Blakes pointed out the noose to McNeely, who promised to instruct Rice to remove it, but the parties dispute whether Rice removed it promptly. (Pl. 56.1 Resp. ¶ 29.) McKnight, among others, complained to Heck about the nooses, and Heck's response to McKnight was only, "I guess the man likes nooses." (Def. 56.1 Resp. ¶ 62; Pl. 56.1 Resp. ¶ 26.)

Finally, over the radio, McNeely questioned why black employees took breaks or stopped their machines, but would not question white employees for similar acts. (Def. 56.1 Resp. ¶ 48.) Blakes told Heck that McNeely was a racist and told WRS's health and safety officer Jerome Prince that McNeely picked on people, "mainly the blacks." (*Id.* at ¶¶ 58-59.) Addison and Blakes also complained to Price about McNeely's behavior and that Heck let McNeely get away with "horseplay and discrimination." (*Id.*)[4]

### 2. Plaintiff-Specific Facts

#### a. Ron Addison

Addison was an operator between July 2007 and January 2008, when he was laid off pursuant to the operators' union contract. (Pl. 56.1 Resp. ¶ 23.) One week after he started work, Addison, a black operator, dumped dirt in the wrong place; Mathis, a white operator, slammed his bulldozer into Addison's truck and hit later hit Addison's truck a second time. (Pl. 56.1 Resp. ¶ 24; Def. 56.1

---

[4]Though it is more background than evidence of racial harassment, the parties hotly dispute whether the black and white employees sat at racially segregated tables in the break trailer. (Pl. 56.1 Resp. ¶¶ 20-21.)

Resp. ¶ 33.)[5]  Addison did not complain directly to WRS that the incident was racially motivated, but raised the incident when the operators met with Scott as part of the noose investigation.  (Def. 56.1 Resp. ¶ 25.)

At another point before October 2007, McNeely trapped Addison in a port-o-potty and tipped it, causing the contents to splash on Addison.  (*Id.* at ¶ 34.)[6]  Addison did not report this incident officially to WRS, but it was discussed over the site's radio.  (Pl. 56.1 Resp. ¶ 33.)  Joe McNeely complained to Heck, as Addison's union, steward that Heck had taken Addison off a bulldozer because of Addison's race.  (Def. 56.1 Resp. ¶ 71.)  Addison also complained to WRS management that black employees had to demonstrate their qualifications for particular tasks, whereas white employees did not.  (*Id.* at ¶ 72.)  Addison also alleges various other disparate treatment during his employment, including that he was not permitted to haul stone and that McNeely gave white employees overtime instead of him.  (Pl. 56.1 Resp. ¶¶ 38-40.)

### b.  J.D. Blakes

Blakes worked as a laborer at the Lake Calumet site between October 2006 and August 2008, when the IEPA shut down the site for budget reasons.  (*Id.* at ¶ 45.)  Blakes was the laborers' union steward and was in charge of reporting violations of the laborer's contract with WRS.  (*Id.*)  McNeely told Blakes that the union would be better off without blacks and Mexicans.  (Def. 56.1 Resp. ¶ 21.)  Blakes also  overheard McNeely say that a white operator should be substituted for Smith because "there needed to be a white guy on the truck."  (*Id.* at ¶ 28.)  Blakes passed the former

---

[5] Addison is "not sure" if the first incident was racially motivated.  (Addison Dep. at 43-44.)

[6] McNeely also rocked port-o-potties with white employees in them including white employees who are not plaintiffs here.  (Pl. 56.1 Resp. ¶ 98.)

comment on to WRS's health and safety officer.  (*Id.* at ¶ 59.)  McNeely also swerved his truck toward Blakes five to ten times.  (*Id.* at ¶ 31.)  Blakes reported McNeely's behavior to WRS management, and on another occasion told Heck that McNeely was a "racist." (Pl. 56.1 Resp. ¶¶ 51, 62.) Although at the time of the swerving incidents, Blakes did not believe McNeely's behavior was racially motivated, he asserts that his unfavorable work assignments were based on his race.  (*Id.* at ¶¶ 56-58.)

### c.    Tyrone Gaston

WRS hired Gaston in October 2006 as an operator and laid him off 21 months later as a result of the IEPA's budget cuts.  (Pl. 56.1 Resp. ¶ 63.)  At one point in June 2007, Heck assigned a white operator, not Gaston, to drive a bulldozer and Gaston went home.  (*Id.* at ¶¶ 71-73.) Gaston believed the reassignment was racially motivated.  (*Id.*)

### d.    Carl McKnight

The operators union sent McKnight to the Lake Calumet site in March 2007 when WRS requested an operator.  (Pl. 56.1 Resp. ¶ 77.)  When McKnight confronted McNeely about throwing soda on McKnight's truck, McNeely told him, "[y]our nigger black ass shouldn't be in this union anyway" and "my granddaddy's blood was built by this union and you shouldn't fucking be in here anyway." (Def. 56.1 Resp. ¶ 24.)  McKnight complained to Heck that McNeely "called him out on [his] name."  (Pl. 56.1 Resp. ¶ 80.)   McKnight also overheard McNeely use the term "nigger" and tell racist jokes to other white operators, and told McKnight directly that a black man on a rolling machine "doesn't look good."  (Def. 56.1 Resp. ¶¶ 23, 27; Pl. 56.1 Resp. ¶ 81.)  McNeely also backed his truck into a port-o-potty with McKnight inside.  (Def. 56.1 Resp. ¶ 34; Pl. 56.1 Resp. ¶

82.)  McKnight also asserts that his equipment was substandard and white operators received overtime instead of him. (*Id.* at ¶¶ 84-86.)

### e.  Nathaniel Roberts

Roberts drove a dump truck at the Lake Calumet site for six months before he was laid off in January 2008 due to IEPA budget cuts.  (Pl. 56.1 Resp. ¶ 87.)  At one point, his radio was sabotaged (though easily fixed).  (Def. 56.1 Resp. ¶ 30, Pl. 56.1 Resp. ¶ 90.)  When he spoke up to complain about it, one of his co-workers commented that it would keep him from listening to "boo boo music." (*Id.*; Roberts Dep. at 136.)  Roberts occasionally heard the word "nigger" coming from a group of white operators and assumed it referred to him because he was the only black person nearby.  (Pl. 56.1 Resp. ¶ 96.)  In another incident, the battery on Roberts' truck was drained; Roberts believes it was intentional, WRS asserts it was the result of an error in the truck's computer. (*Id.* at ¶ 93.)  On his third day at the Lake Calumet site (and a couple of times later), Roberts complained to Heck that McNeely was a racist.  (*Id.* at ¶ 101.)  Roberts also complained to Heck that the equipment assignments were done in a racist manner.  (Def. 56.1 Resp. ¶ 69.)

### f.  Michael Smith

Smith was not a WRS employee, but rather an employee of the company WRS hired to provide a water truck for dust control and washing.  (Pl. 56.1 Resp. ¶ 104.)  WRS, however, exercised day to day control over Smith's activities at the Lake Calumet site.  (Heck Dep. at 557-566, 631.)[7]

---

[7]WRS explicitly did not waive its argument that it is not liable to Smith because Smith was not an employee, but analyzed Smith's claim as if he was an employee.  Because WRS did not raise the issue substantively in its briefing, the Court will treat Smith as if he was a WRS for the purposes of this summary judgment opinion.

### g. Ralph Townes

WRS hired Townes as an operator in December 2006. (Pl. 56.1 Resp. ¶ 117.) Heck called Townes a "boy" at one point, and often called Townes a "bitch" or a "motherfucker," even after Townes asked him to stop. (Def. 56.1 Resp. ¶ 27; Pl 56.1 Resp. ¶ 127.) Townes also overheard McNeely say to another WRS employee that McNeely "didn't want that fucking nigger on the backhoe," referring to Gaston, and that the problem with the union was that it allowed in "blacks and Mexicans." (Def. 56.1 Resp. ¶ 28; Pl. 56.1 Resp. ¶ 125.) After Townes complained that his truck had maintenance issues, Heck called him a "pussy," "a whiny little bitch," and a "certifiable cunt" in front of Townes' co-workers and challenged him to a fight. (Def. 56.1 Resp. ¶ 40.) During the incident, five or six employees had to restrain Townes. (Pl. 56.1 Resp. ¶ 125.) When Townes asked why Heck was discriminating against him by giving opportunities to work on other machines to a white operator, Heck told Townes he was a "fucking troublemaker" and to "get out of his face." (*Id.* at ¶ 65.) At one point, McNeely threatened Townes by holding a screwdriver close to his face. (Def. 56.1 Resp. ¶ 32.) Townes also asserts that a white operator was assigned better equipment than him. (Pl. 56.1 Resp. ¶ 136.)

### C. Associational Harassment of White Employees

#### 1. Kevin Benson

Benson was a laborer at the Lake Calumet site between November 2006 and February 2008. (Pl. 56.1 Resp. ¶ 138.) Benson heard Heck refer to Blakes as "a lazy fucking nigger" on multiple occasions, heard another white operator refer to a rock in the field as a "nigger hat," and saw the nooses on Rice's trucks. (Def. 56.1 Resp. ¶ 133; Pl. 56.1 Resp. ¶¶ 158-59.) McNeely once threatened Benson after Benson spoke up for black employees at a safety meeting. (Def. 56.1 Resp.

¶ 146; Benson Dep. 39-41.)  After one morning meeting, McNeely warned Benson and Herringer to "watch out" because the brakes in McNeely's truck did not always work, and McNeely later veered his truck at Herringer.  (Def. 56.1 Resp. ¶¶ 150-51.)  "A few times" Benson mentioned to a WRS project manager that McNeely was prejudiced.  (Def. 56.1 Resp. ¶ 176.)  Benson believes Heck took him off a job assisting a surveyor with stakes in order to give it to McNeely's father.  (Pl. 56.1 Resp. ¶¶ 152-154.)  He also suspects another white operator drove over markings Benson needed to complete his work.  (Def. 56.1 Resp. ¶ 162.)

2.    **Jim Herringer**

Herringer worked as a laborer at the WRS site the entire time it was open, and served as the laborers' foreman.  (Pl. 56.1 Resp. ¶ 164.)   Heck referred to McKnight as a "fucking nigger"and called other black employees "niggers" a half-dozen times in front of Herringer.  (Def. 56.1 Resp. ¶¶ 42, 137; Pl. 56.1 Resp. ¶ 174.)  At one point, Herringer refused to take over an assignment meant for Blakes; Heck later made a comment that he heard Herringer had just bought a house.  (Def. 56.1 Resp. ¶ 170.)  Herringer took the comment as a threat to do as Heck requested or otherwise be fired. (*Id.*)  Herringer also heard McNeely refer to black employees as "niggers." (Def. 56.1 Resp. ¶¶ 131-32; Pl. 56.1 Resp. ¶ 176.)  McNeely called Herringer a "coon lover" or something similar in front of other white employees, and made veiled threats that Herringer should watch out because sometimes McNeely's "brakes don't work." (Def. 56.1 Resp. ¶ 135; Pl. 56.1 Resp. ¶ 167.)  McNeely later veered his truck at Herringer.  (*Id.* at ¶ 168.)   In another incident, a white operator used his backhoe to knock off Herringer's hard hat.  (Def. 56.1 Resp. ¶ 153.)  Members of McNeely's "clique" would sometimes refuse to accept rides from Herringer from the field back to the break trailer.  (Pl. 56.1 Resp. ¶ 171.)

### 3. Kenneth Huemmer

WRS employed Huemmer as a bulldozer operator for 14 months before laying him off as provided in the operators' contract. (Pl. 56.1 Resp. ¶ 178.) Huemmer heard several other white operators refer to black employees as "niggers." (Def. 56.1 Resp. ¶¶ 130, 134, 140.) McNeely told Huemmer that there were too many "niggers and Mexicans" in the union, and after Huemmer returned from a fishing trip with other black employees, McNeely called Huemmer a "nigger lover." (Def. 56.1 Resp. ¶¶ 134, 141; Pl. 56.1 Resp. ¶ 181.) Huemmer also saw the two nooses in Rice's work and personal trucks, as well as various items with Confederate flags. (*Id.* at ¶¶ 190-92.) Huemmer complained to WRS's health and safety officer about McNeely's "nigger lover" comment, and pointed out one of Rice's nooses to Heck. (Def. 56.1 Resp. ¶ 178; Pl. 56.1 Resp. ¶¶ 181, 192.) At some other point, another white operator also called Huemmer a "nigger lover." (*Id.* at ¶ 182.) McNeely also told Huemmer to "choose his friends" wisely. (Def. 56.1 Resp. ¶ 139.) McNeely excluded Huemmer from side meetings because Huemmer was not a member of McNeely's clique, and veered at him. (Def. 56.1 Resp. ¶ 142.) When McNeely singled out black operators for taking breaks, Huemmer spoke up in their defense. (Pl. 56.1 Resp. ¶ 184.) Finally, Huemmer identifies a series of other slights at the hands of McNeely, Heck and other white operators, including McNeely telling him he was not qualified to load rocks, Heck telling him to continue to operate his bulldozer with a broken blade, and McNeely and Heck giving overtime and more hours to another white operator instead of him. (Def. 56.1 Resp. ¶¶ 164-70, 180; Pl. 56.1 Resp. ¶¶ 195-207.)

### 4. Randy Stevenson

Stevenson operated a bulldozer at the Lake Calumet site for 15 months. (Pl. 56.1 Resp. ¶ 210.) McNeely once told Stevenson, "Don't let that nigger J.D. [Blakes] pick you up for lunch. I

don't want to see you riding in that truck with him." (Def. 56.1 Resp. ¶¶ 37, 134.) Similarly, McNeely told Stevenson that McNeely did not like the people Stevenson sat with at lunch. (Def. 56.1 Resp. ¶ 144.) McNeely referred to black employees as a "niggers" in front of Stevenson. (*Id.* at ¶¶ 134, 144.) In another instance, McNeely drove a truck at Stevenson, narrowly missing him. (Def. 56.1 Resp. ¶¶ 154, 181.) Like Huemmer, Stevenson also asserts various slights from McNeely, including that McNeely glared at him and interfered with his work by dumping dirt on grade stakes. (Def. 56.1 Resp. ¶ 172; Pl. 56.1 Resp. ¶ 221.)

**D.      WRS's Anti-Harassment Policy, Training and Employee Complaint Avenues**

Generally, the parties dispute how much knowledge WRS management had of the alleged racial harassment on the jobsite. (*See e.g.*, Pl. 56.1 Resp. ¶ 47.) It is undisputed that WRS did not provide any harassment training to employees (whether union or management) at the Lake Calumet site and did not give its employees a phone number to contact the company's health and safety officer or human resources department. (Def. 56.1 Resp. ¶¶ 11-12.) WRS's non-discrimination and harassment policy states that WRS will not tolerate "[a]ctions, words, jokes or comments based on an individual's . . . race . . . when it creates an intimidating, offense, or hostile work environment" and threatens discipline (including termination) for anyone who violates it. (Pl. 56.1 Resp. ¶ 9.) Under the policy, employees could bring complaints of harassment to any member of WRS's management, including the field superintendent and the health and safety officer. (Def. 56.1 Resp. ¶ 75.) WRS did not post its nondiscrimination/harassment policy at the Lake Calumet site until the day after the noose appeared on Roberts' truck. (Pl. 56.1 Resp. ¶¶ 9, 18.) At the same time, WRS posted a working hotline for employees to anonymously call in discrimination complaints, but a WRS human resources employee testified that the contract with the hotline provider lapsed before

the noose incident and consequently, WRS employees did not have a hotline for part of the time that they worked at the Lake Calumet site.  (*Id.* at ¶ 18; Perez Dep. at 40-41.)

In addition to the posted policy, some WRS employees remember a stock "Equal Employment Opportunity Is the Law" poster at the worksite that directed employees to call the EEOC to report discrimination.  (Pl. 56.1 Resp. ¶ 10.)  The union contracts covering the operators and laborers contained non-discrimination provisions and grievance procedures, though the parties dispute whether the employees knew about them or whether those procedures would be effective. (*Id.* at ¶ 8.)  WRS also asserts that the site's health and safety director held a safety meeting each day where employees could raise a discrimination complaint, but the plaintiffs assert that the purpose of the meeting was to identify hazards at the site, not to raise discrimination issues.  (*Id.*)

### E.      Retaliation and Termination Claims

#### 1.      McKnight

On July 16, 2007, Heck met with McKnight, as well as Blakes and McNeely as union representatives, to tell him that McKnight's equipment (a "Sheepsfoot Compactor") would no longer be used at the site because it was not heavy enough to meet soil compaction targets.  (Pl. 56.1 Resp. ¶ 117.)  Later, at his deposition, Heck testified that he fired McKnight because he called right before his shift on July 3, 2007 to report he was not coming to work that day, leaving the site shorthanded. (Def. 56.1 Resp. ¶ 129; Pl. 56.1 Resp. ¶ 78.)  However, Heck never told Townes that not coming to work on July 3 was the reason for his termination; rather, the only reason given to Townes was that the Sheepsfoot Compactor was no longer going to be used on the site.  (*Id.*)  Despite Heck's explanation to McKnight, McNeely and another white operator continued to operate the compactor after McKnight was laid off, and when McKnight found out, he complained to his union.  (Def. 56.1

13

Resp. ¶¶ 118-19.)  McKnight went to meet a union representative, who called Heck on speakerphone. (McKnight Dep. at 47.)  During that conversation, Heck promised to bring McKnight back once WRS brought a new compacting machine to the site. (*Id.*)  At the end of July 2007, WRS brought in a new compactor and had Joe McNeely operate it while McNeely continued to operate the Sheepsfoot Compactor. (Def. 56.1 Resp. ¶¶ 125.)

Between June 19, 2007 and July 25, 2007, the Sheepsfoot Compactor was the only compactor at the Lake Calumet site. (Pl. 56.1 Resp. ¶ 122.)  On June 27, 2007, a soil testing company recommended that WRS recompact and test an area of the site. (*Id.* at ¶ 123.)  After that recommendation, McKnight passed each test for the six days he operated the compactor while white operators failed some tests. (Pl. 56.1 Resp. ¶ 123; *see also* WRS 4543-4548.)[8]  Heck's log book, which was the only place Heck wrote down why he terminated McKnight, is lost and WRS has no explanation how or why it disappeared. (Pl. 56.1 Resp. ¶ 120.)

### 2. Townes

When Townes started at WRS, he told Heck he had a vacation planned in February 2007. (Def. 56.1 Resp. ¶ 108.)  Heck said the vacation was not a problem, and told Townes to write down the days he would be gone on the calendar on Heck's desk. (*Id.*)  Townes did as told. (*Id.*)  Townes realized his flight did not leave until the evening of Friday, February 16, 2007, so he showed up at the site that day and Heck permitted him to work. (*Id.* at ¶ 109.)  Townes told Heck he was leaving that night. (*Id.* at ¶ 109-110.)  The parties dispute what happened next.  According to Heck, he asked Townes if he was going to work Saturday and Townes responded that he would. (Pl. 56.1 Resp. ¶

---

[8]In its reply facts, WRS asserts that it took McKnight longer to pass the soil compaction tests than other operators, reducing "site efficiency." (WRS Reply Facts ¶ 18.)

120.)[9] Townes asserts that he took his vacation as planned. (Def. 56.1 Resp. ¶ 109.) When Townes returned, Heck said he was a "no call no show," but Townes showed him the vacation days marked on the calendar. (Def. 56.1 Resp. ¶ 110.) The parties dispute how many times Townes was otherwise late.

On March 15, 2007, Townes overslept and called Heck to tell him he would be late. (Def. 56.1 Resp. ¶ 112.) When he arrived at work, Heck told Townes he was fired because he showed up 40 minutes late. (*Id.* at ¶ 112.) At some point before Townes was fired, Heck told Herringer to come to the trailer and Heck put a call from Townes on speakerphone. (*Id.* at ¶ 113.) Herringer heard Townes explaining why he was not at work, and then heard Heck make a dismissive remark to Townes. (*Id.*) Specifically, Herringer testified that Heck said "maybe [Townes] was laid off or he didn't have a job anymore or something like that, words to that effect." (Herringer Dep. at 31.) Heck then hung up with Townes and said to Herringer, "I told you I can get rid of that fucking nigger." (Def. 56.1 Resp. ¶ 113.) Herringer testified that Heck called Townes a "nigger" on a "couple" of other occasions. (*Id.* at ¶ 114.) Heck's log book entries detailing why he fired Townes are also missing. (*Id.* at ¶ 116.)

### 3. Benson

---

[9] Heck's testimony on this point is confusing. Heck stated that Townes had planned to leave for Las Vegas on a Tuesday or Wednesday, and that Townes would be back on Friday to work on a Saturday. (Heck Dep. at 127.) But WRS does not dispute that Townes reported to work the day Townes was supposed to leave for Las Vegas, and Heck testified that Townes did not work the following Monday or Tuesday after he left. (Heck Dep. at 127.) Had Townes left on a Tuesday or Wednesday, Townes would have missed Thursday and Friday, not Monday and Tuesday.

During his time at WRS, Benson had conflicts with Heck, another superintendent filling in for Heck, two surveyors, Blakes and most of the other operators.  (Pl. 56.1 Resp. ¶139.)[10]  For instance, while Heck was on military leave for two weeks, a temporary superintendent reported to the site's project manager that he and Benson had a heated argument about how to install pipe.  (*Id.* at ¶ 140.)  The project manager told Heck to keep an eye on Benson.  (*Id.* at ¶ 141.)  Heck later saw Benson screaming at a surveyor who misunderstood Benson's instructions.  (*Id.* at ¶ 142.)  Though the parties dispute who started it, it is undisputed that Benson had another dispute with a second surveyor.  (*Id.* at ¶¶ 142-43.)  The parties also dispute whether Benson refused to help other workers unload plywood on January 31, 2008: Heck asserts that Benson refused; Benson says he never refused and the plywood was already unloaded.  (*Id.* at ¶¶ 145-47.)[11]  WRS immediately replaced Benson with another laborer.  (Def. 56.1 Resp. ¶ 184.)

The day after Roberts found the noose on his truck, Benson complained to WRS management about WRS's failure to call the police.  (*Id.* at ¶ 188.)  Benson later appeared in a local NBC news story about racial harassment at the Lake Calumet site.  (*Id.* at ¶ 188.)  The day after the news reporter told WRS that the story would run, January 31, 2008, Benson told Heck that per Benson's attorney, he did not have to work in a hostile atmosphere.  (*Id.* at ¶ 192.)  On February 4, 2008, Heck

---

[10]Benson disputes this statement by pointing to testimony from Heck that people on the site occasionally had profane arguments.  (*See* Pl. 56.1 Resp. ¶ 139.)  That testimony from Heck does not properly dispute that Benson had conflicts with another of other workers at the site.  Similarly, any contention that such disputes were not out of the ordinary for the Lake Calumet site does not properly dispute the statement that Benson had disputes with other workers.

[11]Benson suggests that WRS's story as to why Benson was fired changed because WRS told him that WRS was laying him off, not firing him for cause.  However, Benson testified that he did not hear about the decision from Heck, but rather Herringer, and that Herringer used the term "laid off."  (Benson Dep. at 14-16.)  Indeed, Benson heard WRS was cutting the workforce to lack of funds and weather, and Benson assumed he was being laid off for those reasons.  (Def. 56.1 Resp. ¶ 183.)  In short, there was no inconsistency because no one from WRS management ever officially told him why he was being terminated.

fired Benson after 16 months of employment. (Pl. 56.1 Resp. ¶¶ 138-39.) Heck's stated reasons for firing Benson were because he could not get along with other workers on site and because he refused to work, namely, to help unload plywood to protect an area of the site from a storm. (*Id.* at ¶¶ 145-47.)

### 4. Stevenson

Heck laid off Stevenson for three weeks in January 2008. (Pl. 56.1 Resp. ¶ 210.) McNeely told Heck that Stevenson was the next in line to be laid off, when in fact it was McNeely's father, Joe McNeely, who should have been next. (Pl. 56.1 Resp. ¶¶ 212-13.) Once Heck realized the mistake, he called Stevenson, apologized, and said that he thought he had to retain Joe McNeely because Joe McNeely was a union steward. (*Id.*) Specifically, Heck told Stevenson that he "generally check[s] into things that Jerry McNeely tells [him] and [he] failed to do that" and that he preferred to have Stevenson at the site rather than Joe McNeely. (*Id.*)

## II. STANDARD

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc*., 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). However, the Court may "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Tr.*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is

supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'"). Plaintiffs, as the parties opposing the motion for summary judgment, "get[] the benefit of all facts that a reasonable jury might find." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314 (7th Cir. 2011).

The same summary judgment standards apply in employment discrimination cases as in all other cases. *Alexander v. Wisc. Dept. of Health and Family Servs.*, 263 F.3d 673, 681 (7th Cir. 2001) (citing *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997)). However, intent and credibility frequently are critical issues in employment cases that in many instances are genuinely contestable and not appropriate for a court to decide on summary judgment. *See id.* Nevertheless, summary judgment in favor of the defendant is hardly unknown or, for that matter, rare in employment discrimination cases. *Wallace*, 103 F.3d at 1396.

## III. DISCUSSION

### A. Hostile Work Environment - Black Employees

Employers violate Title VII if discrimination based upon race, national origin, gender or age creates a hostile or abusive work environment. *See Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1033 (7th Cir. 2003). To establish a racially hostile work environment, a plaintiff must submit evidence that: (1) he was subject to unwelcome harassment; (2) the harassment was based

upon his race; (3) the harassment was severe and pervasive so as to alter the conditions of the employee's environment; and (4) a basis for employer liability exists. *See Atanus v. Perry*, 520 F.3d 662, 676 (7th Cir. 2008). For a work environment to be "hostile," the harassment must be "both subjectively and objectively so severe or pervasive as to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005).[12] To determine whether the harassment was objectively hostile, courts consider all of the circumstances, including frequency and severity of the conduct, whether it is threatening, humiliating or merely offensive, and whether the harassment unreasonably interferes with the employee's work. *See Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002); *Venters v. City of Delphi*, 123 F.3d 956, 975-76 (7th Cir. 1997). "[T]he environment must be one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Smith v. N.E. Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004).

### 1. Severity of Hostility

The parties have significant disagreements as to the exact number and nature of the alleged hostile acts targeting each black plaintiffs and whether those events suffice to defeat summary judgment. There is no dispute, however, that all the black plaintiffs either saw the noose that appeared on Roberts' work truck in October 2007, or were aware of it. Crediting the black plaintiffs' version of the events, some of the black plaintiffs saw other nooses and racially charged symbols (including Confederate flags) at the Lake Calument worksite at other times. A noose

> is a symbol not just of racial discrimination or of disapproval, but of
> terror. Those of us for whom a particular symbol is just that—a

---

[12]All the plaintiffs testified the work environment at WRS was subjectively hostile to them (*see e.g.*, Def. 56.1 Resp. ¶ 175), and the parties did not devote any substantive briefing to that issue.

> symbol—may have difficulty appreciating the very real, very
> significant fear that such symbols inspire in those to whom they are
> targeted. No less than the swastika or the Klansman's hood, the
> noose . . . is intended to arouse fear.

*Porter v. Erie Foods Int'l*, 576 F.3d 629, 635 (7th Cir. 2009) (quoting *Vance v. S. Bell Tel. &. Tel.*

*Co.*, 863 F.2d 1503, 1513-14 (11th Cir. 1989) (Fay. J., dissenting) and noting "[t]he noose is a

visceral symbol of the deaths of thousands of African-Americans at the hand of lynch mobs."). In

*Porter*, the Seventh Circuit found multiple nooses, as well as other veiled (but not explicitly racial)

threats rose to the level of a hostile work environment. *Porter*, 576 F.3d at 635.

WRS suggests the noose should only be considered as evidence of a hostile work

environment for Roberts. That ignores both the extreme symbolism of a noose and that the noose

was placed anonymously. That no one took responsibility for the noose and the person who put it

on Roberts' truck was never found makes it even more intimidating, because the black plaintiffs did

not know which of their co-workers to be wary of. Even though not all of the black plaintiffs saw

the noose, a reasonable jury could conclude that it poisoned the workplace for all the black workers,

not just Roberts or the black plaintiffs who saw it. *See Yuknis v. First Student, Inc.*, 481 F.3d 552,

554 (7th Cir. 2007) ("one could be in the target area because a group of which one was a member

was being vilified, although one was not singled out."). In other words, the Court doubts any of the

other black plaintiffs breathed a sigh of relief when they found out the noose was on Roberts' truck,

not theirs.

WRS also suggests that the other nooses and epithets were isolated and not constant. While

a single noose out of the blue at a normally peaceful office may not create a hostile work

environment, a reasonable jury could conclude that the Lake Calumet worksite had at least some

racial tension given the other nooses, threats, and racial epithets that each black plaintiff experienced, and that the October 2007 noose was intended to intimidate all seven black plaintiffs. *See Cerros,* 288 F.3d at 1046 (a court must consider "the totality of the circumstances" when considering if a work environment was hostile). The black plaintiffs have demonstrated a subjectively and objectively hostile work environment.

## 2. WRS's Liability for Hostile Environment

Even if the black employees' environment was hostile, WRS is not necessarily liable for it, because "Title VII is not a strict liability statute." *Porter*, 576 F.3d at 636. The question whether there is a basis for employer liability depends on whether the alleged harassment was perpetrated by supervisors or coworkers. *See Vance v. Ball State Univ.*, 646 F.3d at 469 (citing *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004)); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998), and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764-65 (1998). Employers are "strictly liable" for harassment inflicted by supervisors, but employers can assert an affirmative defense when the harassment does not result in a "tangible employment action." *Williams*, 361 F.3d at 1029 (citing *Ellerth*, 524 U.S. at 756 and *Faragher*, 524 U.S. at 807-08). "If the employer has exercised reasonable care to prevent and correct harassment (typically through an effective anti-harassment policy for the workplace) and the employee has unreasonably failed to avail herself of that policy, then the employer will prevail" via the *Ellerth/Faragher* affirmative defense. *Magyar v. St. Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 771 (7th Cir. 2008); *Penn. State Police v. Suders*, 542 U.S. 129, 134 (2004) (an employer must show "it had installed a readily accessible and effective policy for reporting and resolving complaints of [] harassment."). If only co-workers were culpable for making a work environment hostile, the plaintiff must show that the employer has been

"negligent either in discovering or remedying the harassment." *Williams*, 361 F.3d at 1029 (internal citations omitted); *Parkins v. Civil Constructors of Ill., Inc*., 163 F.3d 1027, 1032 (7th Cir. 1998) ("An employer's legal duty in co-employee harassment cases will be discharged if it takes reasonable steps to discover and rectify acts of . . . harassment of its employees.")  Here, though the parties dispute whether McNeely was a supervisor for purposes of Title VII, and the extent to which Heck participated in the harassment, it is undisputed that WRS never determined who put the noose on Rice's truck, and no one ever admitted to doing so.  In short, WRS has not shown that a co-worker put the noose on the truck, rather than a supervisor.

Whether the noose was placed by a supervisor or co-worker, or whether or not the black plaintiffs experienced a tangible employment action, WRS is not entitled to summary judgment on the black plaintiffs' hostile work environment claim because a reasonable jury could find: (1) WRS failed to exercise reasonable care to prevent the harassment; and (2) WRS was negligent in discovering and remedying the harassment.  Though WRS had a written policy forbidding harassment based on race, WRS did not distribute the policy to its employees, post it at the jobsite before the October 2007 noose incident, or train the employees about what constitutes harassment and how to report it. *See Faragher*, 524 U.S. at 808-09 (finding an employer did not take reasonable steps to prevent harassment in part because the employer never disseminated the policy).

WRS asserts that even though it did not distribute the policy to the employees, the black plaintiffs knew that they could raise discrimination or harassment complaints at a daily safety meeting.  The Court cannot say, as a matter of law, that holding a meeting to discuss safety issues or offering employees the general opportunity to "air grievances" in front of a group of their fellow employees constitutes a reasonable way to combat or prevent harassment.   The record reflects

complaints about racial harassment to the WRS field superintendent and health and safety officer—the proper channels under the unposted policy—and whether the black plaintiffs' reasonably availed themselves of that policy is an issue for the jury, especially where, as here, the black plaintiffs allege their main supervisor was participating in the harassment. In other words, the jury must decide whether the employees were unreasonable when they did not speak up about racial harassment in front of the people who may have been harassing them. Similarly, the Court cannot rule as a matter of law that WRS did not need to look into McNeely's behavior in order to head off future harassment once its management heard complaints about him. Further, a posted policy or harassment training would have given the black plaintiffs more guidance about how to effectively raise the issue with WRS employers more senior than Heck and the other on-site managers. A reasonable jury could conclude that WRS, by allowing its harassment policy to gather dust in a corporate office, instead of being distributed to employees, did not take reasonable care to prevent harassment. WRS is not entitled to summary judgment on the black plaintiffs' hostile work environment claims.

### B. Hostile Work Environment - White Employees (Associational Harassment)

The white employees assert that the Lake Calumet site was a hostile work environment for them because they associated with their black co-workers. To demonstrate a hostile work environment based on association with black employees, the white employees must demonstrate that the same four prongs above, with the key inquiry being "whether the employee has been discriminated against and whether that discrimination was 'because of' the employee's race." *Drake v. Minn. Mining & Mfg.*, 134 F.3d 878, 884 (7th Cir. 1998) (rejecting the notion that a white plaintiff must have a close relationship with a minority co-worker to state a claim for associational

harassment.)    Evaluating the objective severity of the harassment must focus on harassment the white employee himself experienced *because of* that association; a white plaintiff cannot sue for a hostile work environment based on harassment of black employees the white plaintiff happened to see.    *See Bermudez v. TRC Holdings*, 138 F.3d 1176, 1180 (7th Cir. 1998) (finding a white plaintiff may not sue simply based on seeing discrimination against others because "if unease on observing wrongs perpetrated against others were enough to support litigation, all doctrines of standing and justiciability would be out the window"); *see also Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515-16 (6th Cir. 2009) (citing *Bermudez* and noting "we cannot treat all incidents of harassment of African-Americans as contributing to a hostile work environment; rather, only harassment that was directed toward [the white plaintiff] themselves or toward others who associated with or advocated on behalf of African-American employees is relevant to our analysis.")    The Court addresses each white plaintiff's harassment in turn.

Beginning with Herringer, McNeely "might have" called him a "coon lover" or some other similar derogatory once.    That comment is evidence of associational harassment because it focuses squarely on the relationship between the white employee and the black employee.    *See Barrett*, 556 F.3d at 518 (finding the term "nigger lover" to "on its face, constitute[] racial harassment of employees who associate with or advocate for African Americans.")    Herringer also asserts that McNeely threatened him by suggesting McNeely would hit him with a truck, by veering toward Herringer and that McNeely told McNeely's friends not to ride with Herringer.    This is simply not enough.    One possible comment that implicates Herringer's relationship with black employees does not create a hostile work environment based on associating with black employees.    *See Smith v. N.E. Ill. Univ.*, 388 F.3d at 566 ("the mere utterance of an . . . epithet which engenders offensive feelings

24

in an employee is not sufficient to establish a hostile work environment."); *Whittaker*, 424 F.3d at 646 (isolated comments did not create an objectively hostile workplace). Herringer asserts that viewing McNeely's veering and other events which are not explicitly racial through the prism of the "coon lover" comment demonstrates a hostile work environment. However, no reasonable jury could find that one comment converts every other disagreement and incident between white employees into a racially-charged dispute based on one of the employee's association with black co-workers. Finally, Herringer points to various instances where Heck used the term "nigger" to refer to Herringer's friends. That is precisely the type of conduct, directed at a third party, that is not actionable. *See Bermudez*, 138 F.3d at 1180. These instances constitute moments when Herringer was present for reprehensible bigotry; they do not focus on his association with any of his black co-workers.

Much like Herringer, the only explicit associational harassment Huemmer experienced was when two white employees called him a "nigger lover." Other than that, the racially charged comments Huemmer relies on were aimed at black co-workers, not him. Again, those two isolated comments do not mean that everything that McNeely or other white employees did to Huemmer (like interfering with his work) was because he associated with black co-workers. Stevenson arguably experienced less associational harassment than Herringer and Huemmer. McNeely told him that he did not like the people Stevenson ate with, and that Stevenson should not ride with "that nigger J.D. Blakes" to lunch. Like the slights against Huemmer and Herringer, Stevenson's other issues with McNeely and other white employees were not connected with his association with black coworkers except by Stevenson's belief that they were racially motivated. Finally, as for Benson, no one called him a "nigger lover;" rather, McNeely threatened Benson after he advocated for a black co-worker.

25

That isolated incident is insufficient to demonstrate associational harassment, and Benson's other complaints concerning third party harassment and workplace slights fare no better than the other white plaintiffs' complaints. WRS is entitled to summary judgment on all the white employees' hostile work environment claims.

### C. Retaliation - Black Employees

Title VII forbids employers like WRS from "discharg[ing] any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of" his race. 42 U.S.C. § 2000e-2(a)(1). McKnight and Townes, the two black employees alleging they were fired because of their race, may defeat WRS motion for summary judgment on their retaliation claims if they either: (1) present sufficient evidence of discriminatory motivation to create a triable issue of fact (the "direct method") or (2) establish a prima facie case of discrimination under the "burden shifting" method articulated by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (the "indirect method"). *See Sublett v. John Wiley & Sons*, 463 F.3d 731, 736-37 (7th Cir. 2006). McKnight and Townes § 1981 claim for racial discrimination is evaluated under the same framework as their Title VII retaliation claim and the Court will analyze the two simultaneously. *See Alexander v. Wisconsin Dept. of Heath and Family Servs.*, 263 F.3d 673, 681-82 (7th Cir. 2001).

Under the direct method, McKnight and Townes may use two different kinds of evidence to demonstrate that WRS's decisions to fire them was the result of discrimination: (1) direct evidence or (2) circumstantial evidence. *Phelan v. Cook Cty.*, 463 F.3d 773, 779 (7th Cir. 2006). Direct evidence of discrimination is evidence which, if believed by the trier of fact, "will prove the particular fact in question without reliance or inference or presumption." *Miller v. Borden, Inc.*, 168

26

F.3d 308, 312 (7th Cir. 1999) (quoting *Cowan v. Glenbrook Sec. Servs., Inc.*, 123 F.3d 438, 443 (7th Cir. 1997)) (internal quotation omitted). Direct evidence typically is an admission by the decision maker that she acted upon the discriminatory animus. *Phelan*, 463 F.3d at 779. Nevertheless, direct evidence "does not require a virtual admission of illegality" or an explicit reference to McKnight and Townes's race. *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999). Circumstantial evidence generally comes in two forms: "(1) ambiguous statements or behavior toward other employees in the protected group that taken together allow an inference of discriminatory intent and (2) evidence of systematically better treatment of employees outside the protected class." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 393 (7th Cir. 2010).

The indirect method of proof requires McKnight and Townes to introduce evidence demonstrating four prima facie elements to survive summary judgment on her racial discrimination claim: (1) that they are a member of a protected class, (2) that they were performing her job satisfactorily, (3) that they were fired, and (4) that WRS treated a similarly situated non-black individual more favorably. *Dear v. Shinseki*, 578 F.3d 605, 609 (7th Cir. 2009). If they satisfy those elements, thus giving rise to an inference of discrimination, the burden shifts to WRS to identify a legitimate, nondiscriminatory reason for the employment decision. *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010). If WRS offers a nondiscriminatory reason for firing them, "summary judgment would only be erroneous if [McKnight and Townes ] produced evidence that [WRS's] proffered reason was a pretext for racial discrimination." *Montgomery*, 626 F.3d at 394. Where, as here, the plaintiff sets forth evidence that discipline was applied unevenly to black employees and white employees, the "legitimate expectations" inquiry "and the pretext question seemingly merge

because the issue is the same--whether the employer is lying." *Peirick v. Ind. Univ. - Purdue Univ. Indianapolis Ath. Dep't.*, 510 F.3d 681, 687 (7th Cir. 2007).

### 1.    McKnight[13]

McKnight has demonstrated a prima facie case that his termination was racially motivated and that a reasonable jury could find WRS's reason for termination was pretext.  Beginning with the prima facie case, it is undisputed that McKnight is black and was fired.  The parties dispute whether McKnight's compaction performance was at least equal to his white co-workers, but McKnight presented sufficient evidence to demonstrate that for the time period before he was laid off—terminated, really—he performed as well as or better than his white co-workers.  As for pretext, Heck told McKnight that he was laid off because WRS was getting rid of the Sheepsfoot Compactor.  That reason was simply not true: WRS kept the machine, and tapped McNeely to operate it.  Moreover, Heck also promised to bring back McKnight when WRS brought in a new compactor.  But when WRS brought in the new machine, Heck did not call McKnight back in as promised, but rather he selected McNeely's father to operate it.   "One can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision."  *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003).

### 2.    Townes

Heck's comment that he could get rid of "that fucking nigger" is direct evidence, relatively rare from a decision-maker in employment cases, that Heck fired Townes because of his race.  "If

---

[13] Because it finds McKnight defeats summary judgment under the indirect method, the Court does not analyze McKnight's claim under the direct method.

the person who made the derogatory remarks provided input into the employment decision—and the remarks were made around the time of and in reference to that decision—'it *may* be possible to infer that the decision makers were influenced by those [discriminatory] feelings.' " *Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d at 612 (quoting and emphasizing *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 652-53 (7th Cir. 2000)). Such discriminatory remarks are only actionable if there is a real link between the derogatory comments and the adverse employment action. *Id.* (citing *Gorence v. Eagle Food Ctrs. Inc.*, 242 F.3d 759, 762 (7th Cir.2001)). Though WRS points out that Herringer could not remember when he heard the comment, Heck fired Townes for being late, and the conversation concerned an explanation why Townes was not at the site as well as Heck's power to fire him. A reasonable jury could, with some ease, conclude Heck called Townes a nigger in reference to the exact incident that Heck fired Townes for. WRS is not entitled to summary judgment on Townes' termination claim.

### D. Termination Claims - White Employees

#### 1. Benson (Retaliation)

Benson asserts that he was fired in retaliation for complaining about racial discrimination at the Lake Calumet site. "To avoid summary judgment on a retaliation claim under the direct method, [a plaintiff] must produce evidence from which a jury could conclude: (1) that he engaged in a statutorily protected activity; (2) that he suffered a materially adverse action by her employer; and (3) there was a causal link between the two." *Benuzzi v. Bd. of Educ.*, 647 F.3d 652, *34 (7th Cir. 2011). Benson unquestionably meets the second prong. WRS suggests he fails the first prong because he did not complain about associational harassment when he made the comment to Heck on January 31, 2008 that he did not have to work in a "hostile environment." This comment could

reasonably be interpreted to refer to associational harassment or harassment of black employees. Either way, it was protected activity. *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 389-90, 408 (7th Cir. 2007) (a "plaintiff may maintain a cause of action under section 1981, where the plaintiff has suffered retaliation for advocating the rights of those protected under section 1981.").

Finally, Benson demonstrates enough of a link between the January 31, 2008 and his termination to survive summary judgment. WRS does not dispute that Heck fired Benson in part because of the same January 31 plywood loading incident where Benson engaged in protected activity. Even if the parties agreed Benson refused to work that day, the Court cannot separate out, as a matter of law, one part of the incident—Benson's refusal to work—from that protected activity. Further, the timing between Benson's protected activity and his termination is very close. "The closer two events are, the more likely that the first caused the second." *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011). Indeed, adverse actions occasionally "come[] so close on the heels of a protected act that an inference of causation is sensible." *Id.*; *see also McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 797 (7th Cir. 1997) (inference of causality reasonable when two to three days separated employee's protected statement and termination). Though it is unclear exactly when Heck decided to fire Benson, it is undisputed that it was no later than four days after the January 31 incident. That timing is sufficient close to send the claim to a jury, and WRS is not entitled to summary judgment on Benson's retaliation claim.

## 2. Stevenson (Discrimination)

Stevenson asserts that he was laid off because he associated with black employees. Specifically, he asserts that McNeely, who once told him not to ride "with that nigger J.D. Blakes," fed Heck incorrect information that Stevenson was the next to be laid off under the operators'

contract, when in fact it was McNeely's father Joe McNeely who should have been next to go. Stevenson has no direct evidence he was fired because he associated with black employees, and his indirect case also fails because he cannot show WRS's reason for firing him was pretext. He was laid off (temporarily) because Heck made a mistake and did not check McNeely's information. A mistake is not pretext. *See Griffin v. Sisters of St. Francis, Inc.*, 489 F.3d 838, 845 (7th Cir. 2007) (with respect to pretext, "the question is never whether the employer was mistaken, cruel, unethical out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason was the reason.") Stevenson asserts that McNeely's animus against him should be imputed to Heck, the real decision-maker, under the "cat's paw" doctrine. *See e.g., Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011). But even if McNeely was the decision-maker, Stevenson has not shown that McNeely fed Heck the wrong information because of Stevenson's association with black employees rather than simply trying to secure extra work for his father. WRS is entitled to summary judgment on this claim as well.

## IV.    CONCLUSION

For the foregoing reasons:

1.      WRS's motion for summary judgment on the EEOC's and intervening plaintiffs Ron Addison, J.D. Blakes, Tyrone Gaston, Carl McKnight, Nathanial Roberts, Michael Smith, and Ralph Townes' claim for hostile work environment is denied;

2.      WRS's motion for summary judgment on the EEOC's and intervening plaintiffs Kevin Benson, Jim Herringer, Kenneth Huemmer, and Randy Stevenson's claim for hostile work environment is granted;

3.      WRS's motion for summary judgment on McKnight's termination claim is denied;

4.    WRS's motion for summary judgment on Townes's, Benson's and Stevenson's termination claim is denied;

5.    The plaintiffs' motion to compel (Doc. 63) is moot per the plaintiffs' notice (Doc. 71);

6.    The plaintiffs' motion to strike WRS's reply facts (Doc. 100) is denied.


_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: September 27, 2011